**David PEEK, Petitioner-Appellant,**

v.

**Ralph KEMP, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.**

No. 82–8713.

United States Court of Appeals, Eleventh Circuit.

March 5, 1986.

George H. Kendall, Atlanta, Ga., Russell F. Canan, Washington, D.C., for petitioner-appellant.

Mary B. Westmoreland, Nicholas G. Dumich, Atlanta, Ga., for respondent-appellee.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE,

KRAVITCH, JOHNSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

VANCE and ANDERSON, Circuit Judges:

On the evening of June 5, 1976, Grady Peek, Jr. and James Jones were brutally beaten to death. Petitioner David Peek was arrested in connection with the murders early the following morning. After being advised of his rights, petitioner confessed to both beatings, but claimed he did so in self-defense. Peek later recanted this statement and denied any involvement in the murders. He was eventually tried on two counts of capital murder and one of kidnapping. The state's primary witness at trial was Pearlie Mae Lawrence, Grady Peek's girlfriend.

Pearlie Mae Lawrence testified that on the night of the murder, she, Grady Peek, and David Peek went to the White Plains Club in Siloam, Georgia. They returned from the club to the home of Barbara Peek, petitioner's sister. Ms. Lawrence testified that after petitioner's efforts to rape her were thwarted by Grady Peek, petitioner attacked Grady with a stick and beat him to death. He then put the body and the stick in the car, and forced Ms. Lawrence in the car with him. After driving a short distance, petitioner ran the car into a ditch. He then raped Ms. Lawrence.

James Jones, who was living in Barbara Peek's house, came outside to investigate. After petitioner raped Ms. Lawrence he got out of the car and saw Jones behind it. He grabbed the stick with which he had beaten Grady Peek and beat Jones to death. He put Jones' body in the back seat of Jones' own car and Grady's body in the trunk. He locked Ms. Lawrence in the trunk with Grady's body. Petitioner returned to Barbara Peek's house and told Barbara that someone had hurt James Jones. After the police were summoned and Ms. Lawrence gave her statement, petitioner was taken into custody.

On July 28, 1976, Peek was tried on two counts of murder and one count of kidnapping in a superior court in Greene County, Georgia. A jury found him guilty on all three counts and he was sentenced to death. His convictions and sentences were affirmed as to the murders, but the Georgia Supreme Court reversed his death sentence on the kidnapping conviction. *Peek v. State*, 239 Ga. 422, 238 S.E.2d 12 (1972). Following two days of hearings, his convictions and sentences were also upheld in state habeas proceedings. The district court for the Middle District of Georgia denied his petition for habeas corpus relief under 28 U.S.C. § 2254. A panel of this court reversed the district court's denial of the writ and remanded with instructions that the writ be granted. *Peek v. Zant*, 746 F.2d 672 (11th Cir.1984).

We granted the petition for rehearing en banc to consider two issues.[1] First, in a section of this opinion written by Judge Vance we consider whether constitutional error occurred when the Greene County trial court replaced a regular juror, Chester Greeson, with an alternate juror, Ben Weinstein, without personally questioning Greeson to ascertain whether he was too ill to continue deliberations and without instructing the jury to begin its deliberations anew with the substitute juror. In a second section written by Judge Anderson we consider whether the trial court's instructions regarding mitigating circumstances were constitutionally deficient.

## SECTION I. REPLACEMENT OF JUROR

VANCE, Circuit Judge:

(1) Replacing Juror Greeson with Alternate Juror Weinstein

Peek's trial began at 9:00 a.m. on July 28, 1976. At 10:27 p.m. the jury retired to

---

1. In his petition, Peek raises the following additional grounds for reversing his conviction:

 (a) An asserted error in the district court's failure to provide petitioner with an evidentiary hearing to redress the fact that transcripts of the state court proceedings had never been received by a habeas court;

 (b) An alleged denial of petitioner's constitutional right to a fair trial arising from the fact that one of the jurors was allowed to go home for lunch without petitioner's consent;

 (c) An allegedly unconstitutional exclusion of minorities from the grand and petit juries. All three contentions lack merit.

consider its verdict. At midnight the state trial judge sent for the jury and inquired whether a verdict had been reached. The jury foreman responded "no sir." The court then asked the jurors if they wanted to retire for the night or continue their deliberations. He informed them that hotel accommodations had been arranged and that the decision to continue or break for the evening was entirely up to them. The jury foreman asked the court to allow them a few more minutes and the court agreed.

Approximately thirty minutes later, the jury foreman returned to the courtroom and the following exchange took place on the record:

THE COURT: All right. Let the record show that the Foreman has come out and indicated that Mr. Chester Geesling [sic], he feels, is definitely extremely nervous and almost at the breaking point and that they have been trying to do what they could to placate him and keep something from happening and that Mr. Geesling [sic] has requested that he would like to be excused and Mr. Briley, I believe, you said that you will stipulate—

MR. BRILEY: The State will stipulate that he may be excused.

MR. ASHLEY: Under the circumstances, the Defense will stipulate that he may be excused.

THE COURT: All right, sir.

MR. BRILEY: Let's substitute the first alternate, is that—

THE COURT: Well, I think we ought to have the Foreman to advise the, after Mr. Geesling [sic] leaves, to advise the panel that we are not going to just, you know, start excusing at random, because, but I think they are all aware as I understand it from what you say of the situation—

MR. FOREMAN: Everybody else is just fine, but I mean, it is just that that fellow.

THE COURT: Yes, sir. Okay. Well, we'll then, let him go. Let him come on out then.

MR. FOREMAN: You just want me to tell him he can leave?

THE COURT: Yes, sir.

MR. FOREMAN: Because he doesn't want to make a big to do about it.

THE COURT: Right. Well, I haven't got a backdoor [sic] for him to go out. Mr. Weinstein?

MR. WEINSTEIN: Yes, sir.

MR. FOREMAN: Can I just tell him the gist of what we've been talking about?

THE COURT: All right. We have just excused a Juror by agreement of both Counsel and by the Court on word that has come out of the Jury Room here, so, we need to ask you to go in and take his place, please, sir.

At this point juror Chester Greeson was replaced on the jury by first alternate Ben Weinstein. Subsequent fact-finding revealed that at the time of his dismissal, Greeson was the lone holdout as to guilt. This was unknown to the court and both attorneys at the time. Weinstein entered the jury room and the jury returned with guilty verdicts as to all three counts a short time later.[2] The jury then heard arguments on the sentencing phase and after further deliberation reached the decision that Peek should be put to death.

Peek argues that the state trial court committed constitutional error by failing to observe and question Greeson personally prior to dismissing him, and by failing to instruct the jury that they should begin their deliberations anew following the substitution of first alternate Weinstein for juror Greeson. Peek contends that the consequence of these errors was a denial of his right to due process. We conclude that petitioner has failed to demonstrate that the circumstances surrounding juror Greeson's dismissal and first alternate Wein-

2. The trial transcript indicates that only three minutes elapsed between the time Weinstein entered the jury deliberations and the time the jury returned a verdict. The testimony of the various participants in the trial including the judge, both attorneys and the jury foreman, however, indicates that it took the jury between fifteen and thirty minutes to reach a decision after Weinstein entered the deliberations.

stein's substitution were fundamentally unfair and therefore affirm the district court's denial of the writ as to this claim.

■ We begin our analysis by reviewing the findings of fact made by the state habeas court. Section 2254 requires that these findings be accorded a presumption of correctness if they are fairly supported by the record. *See Sumner v. Mata,* 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Sumner v. Mata,* 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). While the state court's habeas findings are not a model of clarity, the following principal findings are present:

(1) Greeson harbored a reasonable doubt as to Peek's guilt at the time he requested to be relieved of his duties;

(2) Greeson's emotional and physical state, however, impaired his voting and participating in deliberations;

(3) The foreman informed Judge Duke that the juror was ill;

(4) Judge Duke formed the correct impression that juror Greeson was ill and unable to continue; and

(5) Both the prosecution and defense agreed to the substitution of first alternate Weinstein for juror Greeson.

Our review indicates that these findings of fact are fairly supported by the record, and we therefore accord them the presumption of correctness required by 28 U.S.C. § 2254.

■ Turning now to the legal consequences of Greeson's dismissal, we begin by recognizing as we have previously that the erroneous replacement of a juror may under certain circumstances deprive a defendant of his valued right to have his trial completed by a particular tribunal, his sixth amendment right to a fair, impartial and representative jury, and his due process rights grounded in the entitlement to procedures mandated by state law. *See Green v. Zant,* 715 F.2d 551, 555–56 (11th Cir. 1983) (*Green* I), *cert. denied,* —— U.S. ——, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984).

Juror Greeson was excused and replaced pursuant to Ga.Code Ann. § 15–12–172 which provides:

> If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated.

Peek contends that Greeson's excusal and the substitution of first alternate Weinstein was in violation of the statute because Greeson was not ill at the time he was excused. In light of the findings by the state habeas court and the supporting evidence in the record, we reject that contention. As stated above, the state habeas court concluded that Greeson's emotional and physical state impaired his voting and participating in deliberations and rendered him unable to continue. The state habeas record is replete with testimony which supports this finding. Greeson's own testimony at the state habeas proceedings was as follows:

> Well, I got sick—I got so upset, I couldn't stand it anymore and it looked like I couldn't make a verdict
>
> . . . .
>
> . . . .
>
> Well, it seemed like that I couldn't make the decision and I just kept getting more and more upset.... And I just got so upset, I—it seemed like—I had to disqualify myself.
>
> . . . .
>
> ... I got so physically—well, mental upset that I knew I couldn't make a decision.

Greeson also responded affirmatively to the following questions:

> And so your physical illness resulted from being mentally upset because of uncertainty about the case, is that right?
>
> . . . .
>
> Did you say that during the deliberations on this case, you just got so physically ill that you did not feel you could continue?
>
> . . . .

And because of your physical condition, you discussed with the Jury Foreman the matter of your being removed from the Jury or asking the judge to allow you to be removed?

. . . .

Mr. Greeson, at the time that you asked to be removed from the Jury, did you feel that you would have difficulty making a decision? Did your physical condition really bother you?

In addition, jury foreman Smith testified as follows:

. . . I thought he [Greeson] was sick and ought to be excused and he agreed and everybody else in there agreed, it would be all right if he left.

. . . .

Yeah, I asked him, you know, how he was feeling. I can remember doing that. I mean, the man kept going to the bathroom and he was turning a dark shade of red and sweat—I mean, his shirt was saturated with sweat. I mean, the man looked sick to me. And I imagine anybody that saw him at that time, you know.

. . . .

I mean, the man just gave me the opinion that he was sick.

. . . .

He indicated before I came out to the Judge that he was sick and that if there was anyway [sic], he would like to go home and that he was just ill.

■ Because we find that the record supports a finding that Greeson was too ill to continue in the deliberations at the time he was dismissed, we find that no constitutional error resulted from the state trial judge's failure to question juror Greeson personally prior to dismissing him. The right to a fair and impartial jury entitles a defendant in a criminal case to be tried by the jury originally selected to determine his guilt or innocence. This right, however, must in some instances be subordinated to the public's interest in fair trials designed to end in jury verdicts. *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). In *Green* I, we held that it would be prejudicial and constitutionally deficient for a trial judge to excuse a juror during deliberations " 'for want of any factual support, or for a legally irrelevant reason.' " *Green v. Zant*, 715 F.2d at 555 (quoting *United States v. Rodriguez*, 573 F.2d 330, 332 (5th Cir.1978)). In *Green* I, the state trial judge, like the state trial judge here, had excused a juror without direct interrogation after the jury foreman reported that the juror was unable to continue in the deliberations. *Green v. Zant*, 715 F.2d at 553. In *Green* I, we remanded the case to the district court to determine factually whether the excused juror had actually been so ill that she could not continue. We expressly noted that if the evidence on remand revealed that the excused juror was too incapacitated to continue at the time of her excusal and that a hearing would have revealed that fact to the trial court, then Green could not complain that he was prejudiced by the court's failure to hold a hearing. *Id.* at 557.

On remand, the district court found that the juror had in fact been too incapacitated to continue at the time of her excusal, and we therefore found no constitutional error in the state trial court's failure to interrogate the witness personally prior to excusing her. *Green v. Zant*, 738 F.2d 1529 (11th Cir.) (*Green* II), *cert. denied*, ── U.S. ──, 105 S.Ct. 607, 83 L.Ed.2d 716 (1984). Because the situation here is almost identical, we likewise find no constitutional error in the state trial court's failure to question and observe Greeson personally prior to his dismissal. Juror Greeson was unquestionably too ill to debate or vote at the time of his excusal. We conclude that the trial judge's decision to excuse Greeson from the jury has a sound basis and no prejudice resulted to the petitioner from the trial judge's failure to question Greeson personally before dismissing him. *See Green* II, 738 F.2d at 1533.

(2) Supplementary Jury Instructions to Begin Deliberations Anew

■ Peek's contention that constitutional error occurred when the trial court failed to instruct the jury to begin its delibera-

tions anew after the substitution of juror Weinstein is also without merit. The only circuit court that has addressed this issue concluded that substituting an alternate juror without instructing the jury to commence its deliberations anew is not constitutional error. *See United States v. Evans*, 635 F.2d 1124, 1127–28 (4th Cir.1980), *cert. denied*, 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958 (1981). In *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B Dec. 28, 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982),[3] we noted the rationale of *Evans* with approval:

> In *Evans* the trial court replaced a regular juror with an alternate after the jury had begun deliberations; however, the defendant expressed himself unequivocally in favor of proceeding with the newly constituted jury. The newly constituted jury was not specifically instructed to begin its deliberations anew, but rather was told only to continue its deliberations. Nevertheless, the appellate court concluded that the "speculative assertion of prejudice ..., to which no objection was raised, was insufficient to justify reversal," stating that "[n]othing *precluded* the jury from starting from the very beginning all over again." 635 F.2d at 1128 (emphasis added).

**3.** In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34.

**4.** The state argues that this issue is not properly before the en banc court because Peek failed to raise it in his habeas corpus petition filed with the district court. Although Peek did not delineate the alleged defect in the mitigating circumstance instruction with specificity or precision, and although the district court did not explicitly address the issue in its order denying habeas corpus relief, we believe that Peek has preserved the issue.

In ¶¶ 49–53 of his petition, Peek alleges that the jury charge failed to adequately inform the jury of the option to grant life despite a finding of one or more aggravating circumstances. Record at 20–22. Although this argument is analytically distinct from one concerning the instruction on mitigating circumstances, it is related in that the latter instruction is given so

644 F.2d at 992 n. 16. The *Phillips* court noted that supplementary instructions to deliberate anew can serve to obviate the danger of undue prejudice when a juror is substituted, but the court did not hold that such instructions were mandated as a matter of constitutional right.

As in *Evans*, the defense counsel here did not object to the lack of supplementary instructions to begin anew when juror Weinstein was substituted, and the jury was not prevented from starting its deliberations from the beginning on its own. The state habeas proceeding revealed that juror Weinstein had attended the entire trial, had heard the charge to the original jury, and had reviewed the case with the jury after he joined them. Because the prejudice alleged by Peek is speculative at best, we conclude that Peek suffered no deprivation of his constitutional rights when the trial court substituted juror Weinstein without instructing the jury to begin its deliberations anew.

## SECTION II. JURY INSTRUCTIONS AT SENTENCING PHASE CONCERNING MITIGATING CIRCUMSTANCES [4]

ANDERSON, Circuit Judge:

 After the jury convicted Peek of kidnapping with bodily injury and two

that the jury has the "option" to weigh mitigating factors on the "life side" of the balance. This circuit has recognized the strong relationship between these two sentencing phase instructions. *Spivey v. Zant*, 661 F.2d 464, 471 (5th Cir., Unit B 1981), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982); *Chenault v. Stynchcombe*, 581 F.2d 444, 447–48 (5th Cir. 1978). In ¶ 57 of his petition, Peek alleges that the trial judge's instruction during the sentencing phase was pervasively unclear and gives as an example a part of that instruction concerning mitigating and aggravating circumstances. Record at 23. Moreover, in ¶ 72, as part of his claim of ineffective assistance of counsel, Peek alleges that "Counsel for Petitioner failed to file any Requests for Charge in the penalty phase of the trial, thereby insuring that the jury would be uninstructed on the definition and meaning of 'extenuation' and 'mitigation.'" Record at 26. Having focused the claim precisely in the ineffective assistance of counsel context, and having alleged generally that the sentencing instructions on mitigating circumstances were "perva-

counts of murder, the jury began its sentencing deliberations. Under Georgia law, in order to impose the death penalty for the capital crimes with which Peek was charged, the sentencing jury must find the existence beyond a reasonable doubt of at least one statutorily defined aggravating circumstance. Ga.Code Ann. § 17–10–31. If no such circumstance is found, the jury may not impose death, and must instead give a sentence of life imprisonment. *Id.* If an aggravating circumstance is found, the jury then may impose death, but it is nevertheless free to grant mercy in any case and sentence the defendant to life imprisonment. *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 46 L.Ed.2d 859 (1976); Ga.Code Ann. §§ 17–10–31, 17–10–2(c). In making its determination, the jury is free to consider any mitigating evidence, *see Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978); *Franklin v. State,* 245 Ga. 141, 263 S.E.2d 666, *cert. denied sub nom., Franklin v. Georgia,* 448 U.S. 913, 101 S.Ct. 32, 65 L.Ed.2d 1176 (1980), and to interpret any evidence as mitigating in its decision to grant mercy. *Spivey v. State,* 241 Ga. 477, 246 S.E.2d 288, *cert. denied sub nom., Spivey v. Georgia,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 699 (1978). In this case, the jury found aggravating circumstances and sentenced Peek to death.

Peek argues that the sentencing jury was not adequately instructed on the nature and function of mitigating circumstances and that, therefore, under binding precedent in this circuit, *see, e.g., Westbrook v. Zant,* 704 F.2d 1487 (11th Cir. 1983), the death sentences must be vacat-

ed.[5] We recognize that the relevant sentencing instructions given in the instant case are virtually indistinguishable from those given in *Westbrook.* The en banc posture of this case, however, permits us to reevaluate *Westbrook.* We believe that the trial court's instructions cannot be evaluated in the abstract, but rather must be considered in context. *See Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). We do not disagree with the underlying premise of *Westbrook* that a jury, when making the awesome decision of whether or not to impose the death penalty, must understand the meaning and function of mitigating evidence. However, we believe that a common sense evaluation of the proceedings in this case indicates that no reasonable juror could have failed to understand the challenged instructions and the role of mitigation.

In its sentencing instructions, the trial judge gave the following instructions concerning mitigating circumstances:[6]

You are authorized to consider the facts and circumstances, if any, in extenuation, mitigation or aggravation of punishment which may have been submitted to you. And of course, no evidence was submitted,[7] but you do have the arguments of the District Attorney for the State and of Mr. Ashley as Counsel of record for the Defendant.

However, it is not essential to your decision that you find extenuating or mitigating facts and circumstances on the one hand, or facts and circumstances in aggravation on the other. Please do not

---

sively unclear," we are persuaded that Peek sufficiently preserved the issue in the district court. We note also that this issue has been briefed to both the panel and the en banc court. For the above-stated reasons, we proceed to review the issue on the merits.

**5.** The panel majority in this case did not reach this issue, apparently because it granted relief with respect to the guilt/innocence phase of Peek's trial. *Peek v. Kemp,* 746 F.2d 672 (11th Cir.1984), *vacated for reh'g en banc,* 746 F.2d 699 (11th Cir.1985). Judge Vance, disagreeing with the majority with respect to its decision granting relief in the guilt/innocence phase, in-

dicated that he would grant relief on Peek's sentencing phase claim because the challenged instructions were indistinguishable from those given in *Westbrook.* 746 F.2d at 695–96 (Vance, J., concurring in part and dissenting in part).

**6.** The trial court's entire sentencing charge is reproduced as Appendix A to this opinion.

**7.** Neither the state nor Peek presented additional evidence during the sentencing phase, although counsel for both parties made arguments to the sentencing jury.

confuse this with the charge which I shall give you a little bit later insofar as statutory aggravating circumstances maybe [sic] concerned.

. . . . .

[quoting from the statute:] "Where a Jury returns a verdict or finding of guilty, the Court shall resume the trial and conduct a Pre-Sentence Hearing before the Jury at which time, the only issue shall be the determination of punishment to be imposed." ...

Now, ... as to capital felonies ... [quoting from the statute:] "In such hearings subject to the laws of evidence, the Jury shall hear additional evidence in extenuation, mitigation and aggravation of punishment including the record of any prior criminal convictions and pleas of guilty or pleas of Nolo Contendere of the Defendant or the absence of any such prior criminal convictions and pleas. Provided; however, that only such evidence in aggravation as the State has made known to the Defendant prior to his trial shall be admissible...."

... [Y]ou will be making only a finding as to certain statutory aggravating circumstances if you find such to exist. And those findings as related thereto, will determine the sentence to be given in this case, that, plus a recommendation. And I will go into that in just a moment. Pertinent portions of Code Section 27–2534.1, entitled "Mitigating and aggravating circumstances, death penalty," reads as follows: And I will tell you that some of this, of course, does not apply, but I have to read it in order that it will make sense. Subsection "(A) The Death Penalty may be imposed for the offenses of aircraft hijacking or treason in any case." Now, of course, we don't have either of those offenses involved here. "(B) In all cases of other offenses for

which the Death Penalty may be authorized the Judge shall consider, or he shall include in his instructions to the Jury. For it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which may be supported by the evidence."

Trial Transcript at 235–37.

As we have indicated, the above instructions are virtually indistinguishable from those given in *Westbrook v. Zant*, 704 F.2d 1487; *see also Tyler v. Kemp*, 755 F.2d 741, 746–47 (11th Cir.1985); *Morgan v. Zant*, 743 F.2d 775, 777–79 (11th Cir.1984); *Finney v. Zant*, 709 F.2d 643 (11th Cir. 1983). The *Westbrook* decision has its origins in *Chenault v. Stynchcombe*, 581 F.2d 444 (5th Cir.1978).[8] In *Chenault*, the petitioner challenged the trial judge's instruction about mitigating circumstances. *Id.* at 447. The court did not resolve the issue because the petitioner had not exhausted his state remedies. *Id.* at 448. The court did, however, hold that the petitioner had stated a claim which implicated a constitutional right. *Id.* at 447–48. The *Chenault* court grounded its decision on the then recent pronouncements of the Supreme Court in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978),[9] as follows:

In view of the two most recent Supreme Court death penalty decisions—*Lockett v. Ohio* ... and *Bell v. Ohio* ...—we conclude that the petitioner's objection does implicate a substantial denial of a federal constitutional right. In *Lockett* the plurality opinion of the Chief Justice, in which Justices Stewart, Powell and Stevens joined, states that the Eighth and Fourteenth Amendments re-

---

**8.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

**9.** In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Bell v. Ohio*, 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), the Supreme Court held unconstitutional the Ohio death penalty statute which precluded the sentencer from considering certain sorts of mitigating evidence.

quire that the sentencing judge or jury must be allowed to consider, as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death".... The plurality would apply this requirement in all cases except perhaps where a mandatory death sentence is needed to deter certain kinds of homicide.... Justice Marshall, although still adhering to his view that capital punishment is always unconstitutional, appears to have suggested that the sentencer must be allowed to consider "the unique individuality of every criminal defendant." ...

It now seems, therefore, that a death sentence imposed by a sentencer barred from considering mitigating circumstances will be vacated by a six-member majority of the Supreme Court.... This constitutional requirement to allow consideration of mitigating circumstances would have no importance, of course, if the sentencing jury is unaware of what it may consider in reaching its decision. We read *Lockett* and *Bell*, then, to mandate that the judge clearly instruct the jury about mitigating circumstances and the option to recommend against death. Thus, the petitioner's contention that the sentencing instructions given by the trial judge were not adequate on this point does implicate a substantial denial of a federal constitutional right.

*Chenault*, 581 F.2d at 447–48.[10]

In *Spivey v. Zant*, 661 F.2d 464 (5th Cir. Unit B Nov. 16, 1981), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), the former Fifth Circuit considered a situation in which the trial court's sentencing instructions did not *mention*, let alone define, mitigating circumstances or indicate their function in the Georgia capital sentencing scheme. *Id.* at 468. The instructions simply told the jurors, amidst a lengthy instruction focusing almost entire-

ly on the function of aggravating circumstances, that "you are authorized to consider all the evidence received by you in open Court, and both phases of the trial ... [and] are authorized to consider all the facts and circumstances of the case." *Id.* In finding the instruction unconstitutional, the court relied upon the prior holding in *Chenault* that the *Lockett* and *Bell* decisions logically required the sentencing jury to understand the nature and function of mitigating evidence, and upon the fundamental constitutional requirement "that a state death sentencing procedure [must] 'allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition on him of a sentence of death.'" *Id.* at 469 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 303, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944 (1976)). A jury which does not understand that the evidence and argument presented to it can be considered in mitigation of punishment cannot give a capital defendant the individualized sentencing hearing which the Constitution requires. Moreover, because of the lack of any instruction on mitigating circumstances, the deficient instruction in *Spivey* focused almost entirely on the concept of aggravation, and may well have skewed the jury towards death and misled the jury with respect to its absolute discretion to grant mercy regardless of the existence of "aggravating" evidence. The *Spivey* court, however, went beyond simple reliance on the lack of any instruction concerning mitigating circumstances and stated its holding as follows:

> the jury must receive clear instructions which not only do not preclude consideration of mitigating factors, *Lockett*, but which also "guid[e] and focu[s] the jury's objective consideration of the particularized circumstances of the individual offense and the individual offender ..."

---

**10.** Since neither the sentencing instructions nor the facts and circumstances of the trial and sentencing proceedings, are set out in the *Chenault* opinion, we cannot determine whether under the standards later announced in *Westbrook* and *Spivey*, or under the standards set out in this opinion, the challenged instruction would have passed constitutional muster.

*Spivey,* 661 F.2d at 471 (quoting *Jurek v. Texas,* 428 U.S. 262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976)).

The *Westbrook* case presented a different situation. The sentencing judge had given, as did the sentencing judge in the instant case, instructions concerning mitigating circumstances. In particular, the sentencing judge had given an instruction authorizing the jury to " 'consider the facts and circumstances, if any, in extenuation, mitigation, or aggravation of punishment....' " *Westbrook v. Zant,* 704 F.2d at 1501. However, the court held that

> [t]he [sentencing] charge fails to provide clear instructions on the function of mitigating circumstances and [gives] no guidance on the relationship between mitigating and aggravating circumstances....
>
> Although the charge authorized the jury to consider circumstances in extenuation or mitigation, ... the court failed to explain what function such a consideration would play in sentencing deliberations. An authorization to consider mitigating circumstances is a hollow instruction when unaccompanied by an explanation informing the jury why the law allows such a consideration and what effect a finding of mitigating circumstances has on the ultimate recommendation of sentence. We cannot fit this instruction within the requirements of *Spivey.*

*Id.* at 1503.

Although the instructions given in *Westbrook* are virtually identical to those given to Peek's sentencing jury, the en banc posture of this case permits us to reconsider the validity of the *Westbrook*[11] holding by reviewing the sentencing charge in context to ascertain whether the jury understood the meaning and function of mitigating circumstances. We must recognize at the outset that, although the *Westbrook* court focused on just one sentence of the trial court's charge, it is well established that a challenged instruction must be evaluated in context:

> In determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. *Boyd v United States,* 271 US 104, 107, 70 L Ed 857, 46 S Ct 442 [443] (1926). While this does not mean that an instruction by itself may never rise to the level of constitutional error, see *Cool v United States,* 409 US 100, 34 L Ed 2d 335, 93 S Ct 354 (1972), it does recognize that a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction.

*Cupp v. Naughten,* 414 U.S. at 147, 94 S.Ct. at 400. The ultimate question is whether there is a reasonable possibility that the jury understood the instructions in an unconstitutional manner. *Francis v. Franklin,* —— U.S. ——, —— n. 8, 105 S.Ct. 1965, 1975–76 n. 8, 85 L.Ed.2d 344 (1985). We conclude that there is no such possibility; rather, we conclude that no reasonable juror could have failed to understand the meaning and function of mitigating circumstances.

Early in its sentencing phase instructions, the trial court made the following statement:

> You are authorized to consider the facts and circumstances, if any, in extenuation, mitigation or aggravation of punishment which may have been submitted to you.

---

**11.** It is difficult to fault the court in *Westbrook* for failing to consider the jury charge as a whole or the attendant circumstances because the state did not argue the issue in that manner. The state merely responded to the petitioner's argument that a particular jury instruction was deficient under *Spivey* by arguing that that instruction, standing alone, was constitutionally adequate.

Trial Transcript at 235. Of course, this instruction, standing alone, does not adequately define the meaning of "mitigation" or "extenuation," nor does it explain the role of these concepts in the jury's task, *i.e.*, that they represent factors which point in the direction of mercy for the defendant. A reasonable juror may not understand the meaning of such legalistic terms,[12] nor are their meanings made clear in the context of that sentence alone. The consecutive appearance of the words "mitigation, extenuation or aggravation" does not serve to distinguish the terms from one another and, therefore, fails to allocate the mitigating function to the defendant and the aggravating function to the state. *See Goodwin v. Balkcom*, 684 F.2d 794, 802 (11th Cir.1982), *cert. denied*, 460 U.S. 1098, 103 S.Ct. 1798, 76 L.Ed.2d 364 (1983). There were in this case, however, additional instructions which served to further enlighten the jury.

Immediately after giving the above instruction, the trial judge told the jury:

However, it is not essential to your decision that you find extenuating or mitigating facts on the one hand, or facts and circumstances in aggravation on the other.

Trial Transcript at 235. Although this instruction did not allocate the mitigating and aggravating functions to the parties, it did indicate clearly, by use of the terms "on the one hand" and "on the other," that the concepts of mitigation (or extenuation) and aggravation are opposite concepts, thus indicating that the "facts and circumstances" relevant to these concepts would be presented for opposing purposes by the opposing parties.

Shortly thereafter, the judge, quoting from the Georgia statute, explained to the jury as follows:

"In such hearings subject to the laws of evidence, the Jury shall hear additional evidence in extenuation, mitigation and aggravation of punishment including the record of any prior criminal convictions and pleas of guilty or pleas of Nolo Contendere of the Defendant or the absence of any such prior criminal convictions and pleas. Provided, however, that only such evidence in aggravation as the State has made known to the Defendant prior to his trial shall be admissible."

Trial Transcript at 236. This instruction gives a very helpful, common sense example of aggravating evidence (*i.e.*, prior criminal convictions) and mitigating evidence (*i.e.*, the absence thereof). No reasonable juror could fail to understand that the defendant's prior criminal record would be presented in aggravation of punishment, and that the absence of a criminal record would be presented in mitigation. A reasonable juror would also understand, regardless of whether the terms "mitigation" or "extenuation" had been given dictionary definitions, that the lack of a criminal record would be a factor presented in favor of the defendant, *i.e.*, in favor of mercy, and that the existence of a prior criminal record would be against the interest of the defendant. The function of such evidence is self-evident. Also, the above-quoted instruction does explicitly allocate the "aggravation" function to the state by indicating that the state was legally required to give the defendant notice of aggravating evidence before presenting such evidence in court. At this point, therefore, a reasonable jury could not have misunderstood that the role of the defense was to present

---

**12.** In *Tucker v. Zant*, 724 F.2d 882, 891 (11th Cir.), *vacated for reh'g en banc*, 724 F.2d 898 (11th Cir.1984), *reinstated in relevant part sub nom. Tucker v. Kemp*, 762 F.2d 1480, 1482 (11th Cir.1985) (en banc), this court approved a sentencing instruction which set out the meaning and role of mitigating circumstances in a clearer fashion. The *Tucker* instruction noted that a mitigating circumstance is a factor which, while not constituting a legal excuse or justification for the offense, could be considered in fairness and mercy as extenuating or reducing the degree of moral culpability or blameworthiness. *Accord Johnson v. Kemp*, 759 F.2d 1503, 1508–09 (11th Cir.1985). While we hold in this case that such clarifying instruction is not constitutionally required in all cases, we nevertheless emphasize that such instruction is manifestly desirable.

evidence and/or argument in mitigation since the concepts of aggravation and mitigation had been identified as opposites.

In addition, other instructions repeatedly cautioned the jury that they were not authorized to recommend the death sentence unless they first found beyond a reasonable doubt at least one of the statutory aggravating circumstances. The trial judge also described the particular statutory aggravating circumstances urged by the state (*i.e.*, that the crimes were committed while the offender was engaged in the commission of another capital felony). *See* Trial Transcript at 237–40. The particular aggravating circumstances described were self-evidently aggravating in nature. Thus, these instructions clearly identified the state's role to adduce aggravating evidence and argument, and clearly indicated that such evidence and argument would be presented in support of the death sentence.

Because the instructions cast mitigating circumstances as being in opposition to aggravating circumstances, and because of the self-evident role of the aggravating circumstances described in the charge and because of the self-evident role of the example given earlier of aggravating and mitigating circumstances—*i.e.*, prior criminal record or absence thereof—we are satisfied that there is no reasonable possibility that the jury failed to understand that it was the defendant's role to present mitigating evidence and argument, and that such evidence and argument would be presented in support of mercy, *i.e.*, a life sentence.

Moreover, other circumstances of the proceedings bolster our confidence that reasonable jurors could not have misunderstood the instructions and the jury's role in evaluating mitigating evidence and argument.

Just prior to the presentation of argument by counsel in the sentencing phase, the following colloquy took place between the trial judge and counsel:

THE COURT: All right, sir. All right, Gentlemen, we come now to the Pre-Sentencing phase. Is there anything that the *State* would like to offer in *aggravation?*

MR. BRILEY: No, Your Honor.

THE COURT: Is there anything in the way of the evidence that the *Defendant* would like to offer in *mitigation? Mitigating circumstances?*

MR. ASHLEY: No, Your Honor.

THE COURT: All right. Mr. Briley, I believe you would have the first and the Defendant would have the last, for any remarks that you would like to make.

MR. BRILEY: Thank you, Your Honor.

Trial Transcript at 234 (emphasis added). The above-quoted passage represents an explicit allocation of functions to the defendant and the prosecutor, an allocation which arguably was only implicit in the court's instructions discussed above. The prosecutor was asked if the state had any aggravating evidence and defense counsel was asked if the defendant had any evidence to offer in mitigation. "Mitigation" is not defined; however, any reasonable juror, upon an explicit indication that the defendant is the party to present "mitigating evidence," could not fail to understand that such evidence is presented in favor of the defendant's position, *i.e.*, mercy. In any event, since this colloquy occurred prior to the jury's instructions it insured that the jury understood from the instructions that the defendant would be presenting mitigating evidence and argument and that such would be presented in favor of the defendant's position, *i.e.*, mercy. We conclude that no reasonable juror could have understood otherwise.

As is indicated in the above-quoted colloquy, immediately after the state and defense counsel indicated that they had no evidence to present in aggravation or in mitigation, counsel made closing arguments to the sentencing jury. Given this sequence of events, there is no reasonable possibility that the jury was not aware that the state's argument would be one in aggravation, *i.e.*, in favor of death, and that

the defense counsel's argument would be one in mitigation, i.e., in favor of life.[13]

Although Peek did not present evidence in the sentencing phase, two mitigating factors—Peek's young age and his lack of any prior criminal record—may have been considered by the jury. Peek testified at the guilt/innocence phase that he was nineteen years old. Trial Transcript at 185–86. In addition, although there was no evidence specifically presented concerning a past criminal record, or the lack thereof, the fact that Peek had no prior criminal convictions emerges from the record. No evidence of prior criminal activity was of record during the guilt/innocence phase, nor did the state present evidence of prior convictions during the sentencing phase, as surely it would have if such existed. The jurors would surely have assumed that the nineteen-year old Peek had no prior criminal record since the judge instructed them, quoting from the Georgia statute, that prior criminal convictions can be considered as aggravating evidence. Therefore, the jurors would surely have expected the prosecutor to present Peek's prior convictions if any existed. Cf. Respondent's Exhibit No. 1 at 77 (report of trial judge dated January 11, 1977: Judge checked box indicating that Peek had no prior criminal record, and wrote that Peek did not have a record "as far as the Court knows").[14] These factors

13. Of course, it is reasonable to assume that the arguments of the district attorney and defense counsel, which lasted twenty minutes and ten minutes respectively, made clear what the function of aggravation and mitigation was, and that each side argued strenuously in favor of its position. These arguments may well have added further assurance that the jury understood the instructions. However, arguments of counsel were not transcribed, see Trial Transcript at 234; thus, we do not rely at all on the presumed content of the arguments, but rather only on the juxtaposition of such arguments with the trial court's explicit allocation of the aggravating and mitigating functions. In addition, we are aware that "arguments of counsel cannot substitute for instructions by the court." Taylor v. Kentucky, 436 U.S. 478, 488–89, 98 S.Ct. 1930, 1936–37, 56 L.Ed.2d 468 (1978); see also Carter v. Kentucky, 450 U.S. 288, 303–04, 101 S.Ct. 1112, 1120–21, 67 L.Ed.2d 241 (1981). Nevertheless, if counsel's arguments had been transcribed in this case, we may well have been able to consider them as casting explanatory light on the jury's understanding of the court's sentencing instructions. The Supreme Court in Taylor held that defense counsel's argument could not substitute for instructions by the trial court in a case where no instruction whatsoever was given on the presumption of innocence to be accorded the defendant. There is an obvious distinction between a situation where the court gives no instruction, and thus the jury is at a loss as to its role, and one where the ordinary processes of a trial serve to illuminate the instructions which the court has given. Any instruction, no matter how clear, will have little meaning except in context. See Cupp v. Naughten, 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973). The trial circumstances allow the jurors to apply the abstract instruction to the case before it. Here, of course, there were numerous instructions on mitigating circumstances, see discussion in text supra, and it would be unrealistic to refuse to consider the context of the guilt/innocence trial and the sentencing hearing, including argument of counsel, in evaluating whether such instructions were properly understood by the jury. See Kentucky v. Whorton, 441 U.S. 786, 789, 99 S.Ct. 2088, 2089–90, 60 L.Ed.2d 640 (1979) ("In short, the failure to give a requested instruction on the presumption of innocence does not in and of itself violate the Constitution. Under Taylor, such a failure must be evaluated in light of the totality of the circumstances—including all the instructions to the jury, the arguments of counsel, whether the weight of the evidence was overwhelming, and other relevant factors—to determine whether the defendant received a constitutionally fair trial."); Taylor v. Kentucky, supra (majority considered prosecutorial argument as relevant to the need for the presumption of innocence instruction at issue, 436 U.S. at 487 n. 14, 98 S.Ct. at 1935 n. 14, although rejecting the adequacy of defense counsel's argument as a substitute for instructions, id. at 489, 98 S.Ct. at 1936–37; dissent would rely in part on voir dire to convey presumption of innocence concept to jury, id. at 492, 98 S.Ct. at 1938); Henderson v. Kibbe, 431 U.S. 145, 153, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) (in concluding that the jury did make a finding on causation, a necessary element of the crime, the Court relied not only on the jury instruction itself, which referred to the causation requirement but was arguably inadequate because of its failure to elaborate, but also relied on the arguments of counsel and the language of the indictment as making it clear to the jury that the causation issue had to be decided); Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).

14. Of course, in all likelihood, defense counsel argued Peek's lack of criminal record to the jury during the sentencing phase. Because the arguments to the jury were not transcribed, we do not rely on such arguments as casting illumination on the court's instructions to the jury. See supra note 13.

would have played a common sense role in the jury's sentencing deliberations. It was not necessary for the judge to tell the jury that these specific factors may be considered in mitigation; their mitigating tendency was self-evident. No reasonable juror could have failed to understand that the only mitigating factors (*i.e.*, young age and absence of criminal record) would tend toward mercy.

Finally, at the close of the sentencing instructions, defense counsel expressly stated that he had no exceptions, an additional indication that all parties present at the proceedings perceived that the instructions did in fact convey to the jury the meaning and function of mitigating circumstances. *Cf. Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court").

In light of the foregoing analysis, we are confident that no reasonable jury could have failed to understand the nature and function of mitigating circumstances, and its own role in evaluating mitigating evidence and argument. There is no reasonable possibility otherwise, and thus the trial court's jury instructions were not constitutionally deficient.

We are bolstered in our finding by the Supreme Court's recent pronouncement in *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). In *Stephens*, before making its determination that the defendant deserved death rather than mercy, the sentencing jury had determined that death was an option by finding beyond a reasonable doubt that three statutory aggravating factors existed. Later, the Georgia Supreme Court declared one of the aggravating factors unconstitutionally vague. The petitioner argued, among other things, that the erroneous instruction concerning the now constitutionally defective aggravating circumstance required that his death sentence be vacated. Although there were other aggravating factors found which would have supported

the death sentence, the petitioner argued that the instruction (and the jury's concomitant finding of the unconstitutional aggravating factor), may have been accorded weight in the sentencing determination. *Id.* at 888, 103 S.Ct. at 2748–49, 77 L.Ed.2d at 257. The Supreme Court rejected this argument, holding that "any possible impact [of the improper instruction] cannot fairly be regarded as a constitutional defect in the sentencing process." *Id.* at 888, 103 S.Ct. at 2748–49, 77 L.Ed.2d at 257 (footnote omitted).

The Court stated that "the absence of legislative or court-imposed standards to govern the jury in weighing the significance ... of ... aggravating circumstances does not render the Georgia sentencing statute invalid as applied in this case." *Id.* at 879–81, 103 S.Ct. at 2744–45, 77 L.Ed.2d at 251–52. In addition, the Court noted that

> the Constitution does not require a State to adopt specific standards for instructing the jury in its consideration of aggravating and mitigating circumstances, and Georgia has not adopted such a system.

*Id.* at 890, 103 S.Ct. at 2750, 77 L.Ed.2d at 258. *See also id.* at 876–77 n. 13, 103 S.Ct. at 2742, 77 L.Ed.2d at 249 n. 13 (it is "clear that specific standards for balancing aggravating against mitigating circumstances are not constitutionally required," (citing *Jurek v. Texas*, 428 U.S. 262, 270, 96 S.Ct. 2950, 2955, 49 L.Ed.2d 929 (1976)); *Briley v. Bass*, 750 F.2d 1238, 1244 (4th Cir.1984) (relying on the subsequent decision of the Supreme Court in *Zant v. Stephens* in rejecting the *Westbrook* line of cases and holding that "the trial judge's failure to offer a fuller explanation of the concept of mitigation [did not] render[ ] the sentences unconstitutional").

We recognize that the challenged instructions in *Stephens* are different than those in the instant case, and *Stephens* is not, therefore, controlling. However, *Stephens* is a strong indication that the Constitution does not require specific and detailed instructions, outlined by the federal courts, with respect to mitigating and aggravating

circumstances, so long as there is no reasonable possibility that the jury misunderstands its role in the capital sentencing procedure or misunderstands the meaning and function of mitigating circumstances. The Supreme Court in *Stephens* did not retreat from its prior insistence on reliability in the sentencing phase of a capital trial and reiterated that "[w]hat is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Zant v. Stephens*, 462 U.S. at 879, 103 S.Ct. at 2745, 77 L.Ed.2d at 251 (citing *Eddings v. Oklahoma*, 455 U.S. 104, 110–12, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) and numerous other cases). We also recognize that death is different in kind from all other criminal sanctions, *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991–92, 49 L.Ed.2d 944 (1976), and that "[b]ecause of that qualitative difference, there is a corresponding difference in the need for reliability and the determination that death is the appropriate punishment in a specific case." *Id.* We have carefully considered that need for reliability in our review of the jury instructions and the attendant circumstances in the instant case. However, because we are convinced that there is no reasonable possibility that

the jury misunderstood its role with respect to mitigating circumstances, we are confident that the need for reliability is satisfied.

 As stated at the outset, we continue to agree with our holding in *Spivey* that the jury instructions must guide and focus the jury's consideration of mitigating circumstances. Today, we elaborate on *Spivey* and hold that the Constitution requires that there be no reasonable possibility that a juror will misunderstand the meaning and function of mitigating circumstances, *i.e.*, that the law recognizes the existence of circumstances which in fairness or mercy may be considered as extenuating or reducing the punishment. What we reject is the notion that the Constitution requires that the jury instructions include any particular words or phrases to define the concept of mitigation or the function of mitigating circumstances. It is sufficient from a constitutional standpoint if it is clear from the entire charge considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances. To the extent that *Westbrook* and its progeny [15] are inconsistent, those cases are overruled.[16]

**15.** *Westbrook*'s progeny includes *Dix v. Kemp*, 763 F.2d 1207, 1208–10 (11th Cir.1985); *Tyler v. Kemp*, 755 F.2d 741, 746–47 (11th Cir.1985); *Morgan v. Zant*, 743 F.2d 775, 777–79 (11th Cir.1984); *Finney v. Zant*, 709 F.2d 643 (11th Cir.1983). To the extent that such cases are inconsistent with our opinion today, they are overruled.

**16.** After holding that the jury charge must guide and focus the jury's consideration of mitigating circumstances, the *Spivey* panel continued as follows:

> *In most cases*, this will mean that the judge must clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death; in order to do so, the judge will *normally* tell the jury what a mitigating circumstance is and what its function is in the jury's sentencing deliberations. *In some instances, it will be possible for the judge clearly to instruct the jury so as to guide and focus* its consideration of the particularized circumstances of the individual offense and the individual offender *without explicitly defining the nature and function of mitigating circumstances:* if, for example, the

> state sentencing procedure permits the jury to impose the death penalty only after giving specified answers to special interrogatories, and if those interrogatories satisfactorily focus the jury's consideration on the circumstances of the offense and the offender, then the requisite guidance is achieved without explicit discussion of mitigating circumstances. 661 F.2d at 471 (emphasis added) (footnotes omitted). As *Spivey* recognized, explicit definition of mitigating circumstances and their function is not constitutionally required in every case. What is required, as we hold today, is that it be clear from the jury instructions considered in context that a reasonable jury could not have misunderstood the meaning and function of mitigating circumstances.

We acknowledge that the above quotation from *Spivey* seems to imply that only rare cases will pass constitutional muster without an explicit definition of the meaning and function of mitigating circumstances, whereas it is clear from our holding today that such cases may not be so rare. Of course, the *Spivey* panel was not presented with a jury charge in which it was, or could have been, argued that the jury did in fact

In light of the foregoing, we hold that the court's instructions concerning mitigating circumstances were not constitutionally deficient and, therefore, Peek is not entitled to a new sentencing hearing on that ground.

## SECTION III. CONCLUSION

Finding no merit in Peek's challenges to the constitutionality of his convictions and sentences, the judgment of the district court denying habeas corpus relief is

AFFIRMED.

## APPENDIX A

### THE CHARGE OF THE COURT

Ladies and Gentlemen of the Jury, the Defendant in this case has been found guilty of the three Counts in the Bill of Indictment against him, wherein he's charged with Count 1, Kidnapping, Count 2, Murder, and Count 3, Murder. I'd like to read to you again the two Code Sections that are involved in this. And I can now read them to you in their entirety whereas previously, they were only given to you in pertinent parts. Code Section 26–1311 reads as follows: "Kidnapping, subsection (A) A person commits Kidnapping when he abducts or steals away any person without lawful authority or warrant and holds such person against his will." Then, the last paragraph of the section, "A person convicted of Kidnapping shall be punished by imprisonment for not less than one nor more than 20 years provided that a person convicted of Kidnapping for ransom shall be punished by life in prisonment [sic] or by death."

Now, we do not have Kidnapping for ransom in this case. But then, it goes on and says, "and provided further, that if the person Kidnapped shall have received bodily injury, the person convicted shall be punished by life imprisonment or by death." Code Section 26–1101, entitled Murder, reads as follows, subsection "(A) A person commits Murder when he unlawfully and with malice aforethought either express or implied causes the death of another human being. Express malice is that deliberate intention unlawfully to take away the life of a fellow creature which is manifested by external circumstances capable of proof. Malice shall be implied where no considerable provocation appears and where all of the circumstances of the killing show an abandoned and malignant heart." And subsection, (C) which reads as follows, "A person convicted of Murder shall be punished by death or by imprisonment for life." And now it is your duty, in regards to these three particular Counts within the limits prescribed by law, to determine the penalty which shall be imposed as punishment for these three offenses which, as I have just indicated to you, are all capital felonies.

In arriving at the determination for the punishment for Kidnapping and Murder, you are authorized to consider all of the evidence received in Court presented by both the State and the Defendant throughout the trial before you. You are authorized to consider the facts and circumstances, if any, in extenuation, mitigation or aggravation of punishment which may have been submitted to you. And of course, no evidence was submitted, but you do have the arguments of the District Attorney for the State and of Mr. Ashley as Counsel of record for the Defendant.

---

understand the meaning and function of mitigating circumstances; thus, the conflicting inference in *Spivey* is dicta. Moreover, the *Spivey* dicta remains as a powerful admonition of the kind of jury instructions which will satisfy constitutional requirements. The minimum constitutional requirement is that the jury instructions must guide and focus the jury's consideration of mitigating circumstances so that there is no reasonable possibility that the jury will fail to understand the meaning and function of mitigating circumstances. Obviously, the only sure way to attain the constitutional minimum is for the jury charge to explicitly define the meaning and function of mitigating circumstances. Thus, the instructions should clearly communicate that the law recognizes the existence of circumstances which may not justify or excuse the offense, but which, in fairness or mercy, may be considered as extenuating or reducing the punishment. *See Spivey*, 661 F.2d at 471 n. 8.

However, it is not essential to your decision that you find extenuating or mitigating facts and circumstances on the one hand, or facts and circumstances in aggravation on the other. Please do not confuse this with the charge which I shall give you a little bit later insofar as statutory aggravating circumstances may be concerned.

Now, the laws of Georgia were changed by the General Assembly in 1974 to provide that the Judges would impose the sentences in all cases rather than the Juries except in capital felonies. This change of law as I said, was during the 1974 session and became effective on July 1, 1974. Your responsibility will be to make a further determination as related to your verdicts of guilty as to Counts # 1, 2, and 3, charging the Defendant guilty of the offenses of Kidnapping, Murder and Murder which as I have already stated to you, are all three capital felonies. I would like to call to your attention the pertinent portions of Code Section 27–2534, which has to do with this part of the proceedings that we are now in. "Pre-Sentence Hearings in felony cases. At the conclusion of all felony cases heard by a Jury, and after argument of Counsel and proper charge from the Court, the Jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment." May I veer off here to say, you have already accomplished that. "Where a Jury returns a verdict or finding of guilty, the Court shall resume the trial and conduct a Pre-Sentence Hearing before the Jury at which time, the only issues shall be the determination of punishment to be imposed."

Now, that is only as related now, and I think you will see as I cite it a little bit later, as to capital felonies, because as I stated to you as to all other felonies, it is now the duty of the Court to impose punishment. "In such hearings subject to the laws of evidence, the Jury shall hear additional evidence in extenuation, mitigation and aggravation of punishment including the record of any prior criminal convictions and pleas of guilty or pleas of Nolo Contendere of the Defendant or the absence of any such prior criminal convictions and

pleas. Provided, however, that only such evidence in aggravation as the State has made known to the Defendant prior to his trial shall be admissible. The Jury shall also hear argument by the Defendant or his Counsel, and the Prosecuting Attorney as provided by law regarding the punishment to be imposed. The Prosecuting Attorney shall open and the Defendant shall conclude the arguments to the Jury. Upon the conclusion of the evidence and the arguments, the Judge shall give the Jury appropriate instructions and the Jury shall retire to determine the punishment to be imposed."

Now, this is is a real pertinent part, "In cases in which the Death Penalty may be imposed by a Jury, the additional procedure provided in section 27–2534.1," and I will charge you the pertinent portions of that Code Section in just a minute, "shall be followed. The Jury shall fix a sentence within the limits prescribed by law. The Judge shall impose the sentence fixed by the Jury as provided by law."

Now, that has been been modified to the extent that you will be making only a finding as to certain statutory aggravating circumstances if you find such to exist. And those findings as related thereto, will determine the sentence to be given in this case, that, plus a recommendation. And I will go into that in just a moment. Pertinent portions of Code Section 27–2534.1, entitled "Mitigating and aggravating circumstances, death penalty," reads as follows: And I will tell you that some of this, of course, does not apply, but I have to read it in order that it will make sense. Subsection "(A) The Death Penalty may be imposed for the offenses of aircraft hijacking or treason in any case." Now, of course, we don't have either of those offenses involved here. "(B) In all cases of other offenses for which the Death Penalty may be authorized the Judge shall consider, or he shall include in his instructions to the Jury. For it to consider, any mitigating circumstances or aggravating circumstances otherwise authorized by law and any of the following statutory aggravating circumstances which

may be supported by the evidence." And I give you in charge only two of those specific statutory aggravating circumstances that are set out there. They both deal with "the offense of one capital felony being committed while the offender was engaged in the commission of another capital felony."

In this case, there would be the offense of Kidnapping was committed while the offender was engaged in the commission of another capital felony, to-wit Murder. Or as to Count, that is to Count 1, as to Count 2 and 3, the offense of Murder was committed while the offender was engaged in the commission of another capital felony, to-wit Kidnapping or, two, the offense of Murder was committed while the offender was engaged in the commission of another capital felony, to-wit Murder, and conceivably you could find both of those statutory aggravating circumstances and contend that the offense of Murder was committed while the offender was engaged in the commission of both capital felonies, to-wit Kidnapping and Murder.

And finally, subsection (C) of that Code Section reads, "The statutory instructions as determined by the trial judge to be warranted by the evidence shall be given in charge and in writing to the Jury for it's deliberations. The Jury if its verdict be a recommendation of death, shall designate in writing, signed by the Foreman of the Jury the aggravating circumstance or circumstances which it found beyond a reasonable doubt. Except in cases of treason or aircraft hijacking, unless at least one of the statutory aggravating circumstances enumerated in this section is so found, the Death Penalty shall not be imposed."

I charge you Code Section 27–2302, which reads as follows: "Recommendation to Mercy. In all capital cases other than those of homicide, when the verdict is guilty with a recommendation to mercy, it shall be legal and shall be a recommendation to the Judge of imprisonment for life. Such recommendation shall be binding upon the Judge."

I charge you Code Section 26–3102, which reads as follows: "Capital offenses, Jury Verdict and Sentence. Where upon a trial by Jury, a person is convicted of an offense which may be punishable by death, a sentence of death shall not be imposed unless the Jury verdict includes a finding of at least one statutory aggravating circumstance and a recommendation that such sentence be imposed. Where a statutory aggravating circumstance is found and a recommendation of death is made, the Court shall sentence the Defendant to death. Where a sentence of death is not recommended by the Jury, the Court shall sentence the Defendant to imprisonment as provided by law. Unless the Jury trying the case makes a finding of at least one statutory aggravating circumstance and recommends the death sentence in it's verdict, the Court shall not sentence the Defendant to death provided that no such finding of statutory aggravating circumstance shall be necessary in the offenses of treason or aircraft hijacking. The provisions of this section shall not effect the sentence when the case is tried without a Jury or when the Judge accepts a guilty plea."

Now, I have prepared for you here, the certain statutory aggravating circumstances as applied to this case which is required under law as I have already referred to the Code Section and to those, hoping that it may be of some help to you in a form which will go out with you, so, that you may perform the duty expected of you under these Code Sections which I have just read.

The first one is headed with the heading of the case and says, "As to Count 1, 2," and that 2 is just the second listed aggravating statutory circumstance. It reads, "The offense of Kidnapping was committed while the offender was engaged in the commission of another capital felony, to-wit Murder. 1. Do you find that the statutory aggravating circumstances above set out has been shown beyond a reasonable doubt?" And there's a place for you to either check yes or no. "2. If the question above is answered yes, do you recommend

the Defendant David Peek, be given the Death Penalty or Life Imprisonment?" And you check whichever one you indicate. It's then, to be dated and signed by your Foreman.

As to Count 2, the heading again of the case, "# 1." And here's where you have two alternatives, either/or or both. "The offense of Murder was committed while the offender was engaged in the commission of another capital felony, to-wit Kidnapping. Or, the offense of Murder was committed while the offender was engaged in the commission of another capital felony, to-wit, Murder."

Now, conceivably as I have said before, the offense of Murder as charged in count 2 could have been committed while the offender was engaged in the commission of two capital felonies, one, for Kidnapping and another for another Murder. So, "Do you find that the statutory aggravating circumstances above set out, one or two have been shown beyond a reasonable doubt?" And your answer would be, either yes or no. "Which one?" And you would either check one or two. And if you felt that both of them existed, you would check both of them. "If the question above is yes, do you recommend that the Defendant, David Peek, be given the Death Penalty or Life Imprisonment?" And you must check one or other of those and let it be dated and signed by your Foreman.

You have the same alternatives as to Count 3, because Count 3 is also, Murder and you have the choice between, "the offense of Murder being committed while the offender was engaged in the commission of another capital felony, to-wit Kidnapping. Or the offense of Murder was committed while the offender was engaged in the commission of another capital felony, to-wit, Murder." Or a finding of both. "Do you find that the statutory aggravating circumstances above set out, one or two, has been shown beyond a reasonable doubt?" And a place to check yes or no, "which one," one or two and if you believe both, you can check both. "If the question above is answered yes, do you recommend that the

Defendant, David Peek, be given the Death Penalty or Life Imprisonment." And you would check one or the other and it would be dated and signed by your Foreman and returned back into Open Court.

Now, Ladies and Gentlemen, I charge you that you shall not in your verdict as to punishment on Counts 1, 2, or 3 against this Defendant, recommend punishment by death if you find the statutory aggravating circumstances exist under the influence of passion, prejudice or any other arbitrary factor. But as I have previously stated, it should be based on the evidence presented in this case and in the original case and the law which I gave you prior to this charge on the original case to a moral and reasonable certainty and beyond a reasonable doubt.

The determination of guilt or innocence is now past and has been made. And now the Jury, if it's verdict be a recommendation of Death, shall designate it in writing, signed by the Foreman of the Jury on this form, the aggravating circumstances which it finds beyond a reasonable doubt would likewise be designated.

Unless the statutory aggravating circumstance or one of them, enumerated, on these forms is found beyond a reasonable doubt, the Death Penalty shall not be imposed.

In short, Members of the Jury, as I have said, before you would [sic] authorized to recommend the Death Penalty, you must be satisfied that the State has proven to you to a moral and reasonable certainty and beyond a reasonable doubt that the statutory aggravating circumstance given you or one of them given you in this charge as related to each of the Counts, have or has been proven to you to a moral and reasonable certainty and beyond a reasonable doubt. You must write your verdict as you have before and you must determine as I have said, if you find an aggravating circumstance, indicate whether you recommend the Death Penalty or Life Imprisonment. If you do not find either of the statutory aggravating circumstances, then, the penalty will automatically be life

imprisonment. Remember again, that this decision must be unanimous and agreed to by all twelve of you. Now, you may once again retire and consider the punishment feature of your verdict.

KRAVITCH, Circuit Judge, concurring specially in part and dissenting in part, in which CLARK, Circuit Judge, concurs in Part II:

## I. JUROR SUBSTITUTION

I concur in the result reached by the majority in denying habeas corpus relief on the jury substitution and jury reinstruction claim; I write separately because I do not agree with all of the majority's reasoning. The majority concludes that there was no impropriety in the manner in which the trial judge excused juror Greeson and substituted alternate Weinstein. I cannot agree.[1] Peek's counsel, however, not only explicitly consented to the juror substitution, but failed to request instructions that the jury begin deliberations anew. Moreover, this is not an instance where a right personal to the defendant has been improperly waived by an attorney. Thus, in my opinion, any challenge to the juror substitution is foreclosed.

The Constitution secures the right of the defendant accused of serious criminal charges to be tried by a jury of properly chosen jurors. *Apodaca v. Oregon*, 406 U.S. 404, 413, 92 S.Ct. 1628, 1634, 32 L.Ed.2d 184 (1972) (plurality opinion); *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). This right cannot be waived by an attorney without a defendant's consent, *Patton v. United States*, 281 U.S. 276, 50 S.Ct. 253, 74 L.Ed. 854 (1930). In order to safeguard this right, the defendant must be present or personally waive his right to be present at the critical trial phase of jury selection.

*See United States v. Crutcher*, 405 F.2d 239, 242–43 (2d Cir.1968) (discussing *Lewis v. United States*, 146 U.S. 370, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)), *cert. denied*, 394 U.S. 908, 89 S.Ct. 1018, 22 L.Ed.2d 219 (1969); *see also United States v. Bascaro*, 742 F.2d 1335, 1349 (11th Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 3476, 87 L.Ed.2d 613 (1985); *United States v. Crews*, 695 F.2d 519 (11th Cir.1983) (per curiam). Under Georgia law, an alternate juror is chosen subject to the same qualifications and peremptory challenges as a regular juror. O.C.G.A. § 15–12–170 (1985). It therefore follows that, absent subsequent juror misconduct, the proper time for a defendant to object to the seating of an alternate juror is at the jury selection voir dire. Were we to determine that the right to object to juror substitution was personal to a defendant, trial judges would need a defendant's permission before replacing an incapacitated juror. This would effectively allow a defendant to re-challenge a juror the defendant had previously approved at the initial jury selection voir dire. Such a result would be inconsistent with the teaching of *Apodaca v. Oregon*, 406 U.S. at 413, 92 S.Ct. at 1634, that a defendant is entitled only to a fairly chosen jury, not specific jurors. *See also McCray v. Abrams*, 750 F.2d 1113, 1128 (2d Cir.1984). Accordingly, once an alternate juror is properly impanelled and a legitimate need arises to replace a juror, the trial court need not consult the defendant personally before substituting the alternate.

Georgia law vests discretion in the trial judge to call alternate jurors, O.C.G.A. § 15–12–168, to separately sequester an alternate after the jury retires, O.C.G.A. § 15–12–171, and to determine when an alternate juror is required, O.C.G.A. § 15–

---

1. Had Peek's attorney objected to the substitution because the court had not adequately explored the plausible alternatives to excusing juror Greeson, I would join Judge Johnson's dissent. Given the late hour, the court should have excused the jury until morning to ascertain whether sleep and/or brief medical attention would have allowed Greeson to continue. The

court, however, exercised its discretion only after the explicit approval of the attorneys for both sides. Thus, unlike *United States v. Virginia Erection Corp.*, 335 F.2d 868 (4th Cir.1964) (trial court improperly delegated discretion to replace ailing juror to jury foreman), the court removed Greeson *after* the parties stipulated that the juror be removed.

12–172. Georgia trial courts cannot, however, choose which particular alternate will replace an incapacitated juror. Alternate jurors are pressed into service in the order they are seated. *Id.* Accordingly, the discretion vested in the trial court does not necessarily implicate constitutional rights: constitutional rights would be violated if a juror were dismissed without factual support indicating incapacity or for legally irrelevant reasons. *Green v. Zant,* 715 F.2d 551, 555–56 (11th Cir.1983). *Green* focuses our attention on whether there is factual support that a juror was indeed incapacitated.[2] The majority relies on the state habeas corpus proceedings for this support. I believe that the stipulation entered into by Peek's attorney provides this support.

As noted in *Green,* in many cases a juror's inability to continue will be evident and the trial court need not conduct an elaborate hearing. *Id.* at 555. In those cases where incapacity is less obvious, some hearing or inquiry is appropriate. *Id.* at 556. Ideally, this inquiry would entail the direct questioning of the afflicted juror. Here the court questioned the jury foreman about the indisposed juror. This inquiry, however, was conducted in the presence of both counsel who stipulated that the ill juror be excused. Although better practice would have dictated that the judge question Greeson personally or wait until the

next morning to assess his condition, our review is essentially whether the court abused its discretion in determining that Greeson was too ill to continue. Given that both counsel stipulated to the excusal of Greeson, I cannot say that the trial court committed reversible error. There was apparently enough of an inquiry to convince both attorneys that Greeson could not continue. Peek cannot now claim that the court abused its discretion by acting pursuant to his attorney's stipulation.

## II. JURY INSTRUCTIONS AT SENTENCING PHASE CONCERNING MITIGATING CIRCUMSTANCES

I respectfully dissent from section two of the majority's opinion. The specific *Westbrook* claim addressed by the majority was neither raised below nor addressed by the district court; accordingly, I would not reach it. Moreover, I disagree with the majority's disposition of this claim.

### A. *The Procedural Bar to Reaching The Claim.*

In *Westbrook v. Zant,* 704 F.2d 1487 (11th Cir.1983), a panel of this court applied *Spivey v. Zant,* 661 F.2d 464 (5th Cir.1981), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982) and vacated a death sentence where the trial court had failed to

**2.** Although a trial court may commit constitutional error by not adequately determining whether a juror is too ill to continue, *Green,* 715 F.2d at 555, this court has never definitively settled whether a defendant must consent to his attorney's stipulation that a juror is too ill to continue. In *United States v. Allison,* 481 F.2d 468, 473 (5th Cir.1973) the former Fifth Circuit determined that a defendant did not have to be present when his attorney stipulated to allowing an alternate juror to retire with the jury as it began deliberations. The *Allison* analysis regarded the stipulation as entered into as a conference on a point of law that did not occur at a critical stage of the proceedings. The *Allison* court, however, also relied on the defendants' implicit acquiescence to the stipulation: the stipulation was explained to the defendants in open court and they did not object.

The *Peek* panel opinion relied on *Leser v. United States,* 358 F.2d 313 (9th Cir.1966) (defendants could not challenge the replacement of a juror on grounds that they had not consent-

ed). Because the *Leser* defendants were present and aware of the substitution of a juror after deliberations had begun, the court did not have to determine whether counsel could stipulate absent defendants' consent. The *Leser* court did, however, rely on *Robinson v. United States,* 144 F.2d 392, 397 (6th Cir.1944) (the first appellate decision rejecting a constitutional challenge to the federal act providing for alternate juror substitution). In *Robinson* an alternate replaced a juror during trial, but before deliberations. I believe the rationale of *Robinson* applies equally in a case where a juror must be excused from deliberations. As in *Robinson,* Peek was tried by "an impartial jury of twelve" —the substituted alternate "was a competent juror ... unchallenged upon any ground of personal disqualification." *Leser,* 358 F.2d 313 (quoting *Robinson,* 144 F.2d at 397). *Robinson* thus suggests that the right to an impartial jury is insured by the defendant's ability to challenge an alternate when the alternate is chosen, not when the alternate is pressed into service.

adequately inform the jury "what a mitigating circumstance is and what its function is in the jury's sentencing deliberations." *Westbrook*, 704 F.2d at 1503 (quoting *Spivey*, 661 F.2d at 471). The majority takes this opportunity to reevaluate jury instructions that were deemed inadequate in *Westbrook, supra; Tyler v. Kemp*, 755 F.2d 741, 746–47 (11th Cir.1985); *Morgan v. Zant*, 743 F.2d 775, 777–79 (11th Cir. 1984); and *Finney v. Zant*, 709 F.2d 643 (11th Cir.1983). Clearly this court sitting en banc may change circuit precedent. We usually do so only after full consideration of a claim by the district court and a panel of this court.

In *Westbrook*, a death row inmate asserted that instructions at the sentencing phase of his trial failed to inform the jury of its life option (the option to impose a life sentence even though aggravating factors are present and mitigating factors are absent) and also failed to adequately inform the jury of what a mitigating circumstance is. The *Westbrook* court rejected the inmate's life-option challenge, 704 F.2d at 1502–03, but granted relief because the instructions inadequately defined the nature and function of mitigating circumstances. *Id.* at 1503. *Westbrook* thus demonstrates that failure to instruct regarding a jury's life-option and failure to adequately define the nature and function of mitigating circumstances are discrete claims. In his habeas corpus petition, Peek challenged the ambiguity of his sentencing charge only to the extent that the court did not adequately inform the jury of its life option.[3] He did

---

**3.** Peek's entire challenge to the sentencing charge is as follows:

> G. *Deprivation of the Right To A Clear and Unambiguous Charge to the Jury By the Trial Judge In the Penalty Phase of the Trial*

> 49. Petitioner was deprived of his right, at the sentencing phase of his trial, to a clear and unambiguous charge by the trial judge to the jury that it could impose a life sentence even if they determined that one or more statutory aggravating circumstances were present, in violation of his rights as guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the Constitution of the United States.

> *Facts Supporting Petitioner's Allegations That the Charge of the Trial Judge To the Jury At the Sentencing Phase of the Trial Was Neither Clear Nor Unambiguous*

> 50. Nothing in the trial judge's charge to the jury in the penalty phase of Petitioner's trial instructed the jury that it was within their discretion to impose a life sentence, even if they found the existence of one or more aggravating circumstances. The following references to life imprisonment were made in the trial judge's charge to the jury:

> (a) He recited the provisions of the Georgia Code as it pertains to the possible punishments available for those convicted of kidnapping with bodily injury or murder;

> (b) He charged, in full, Ga.Code Ann. § 27–2302:

> Recommendation to Mercy: In all capital cases *other than those of homicide,* when the verdict is guilty with a recommendation to (sic) mercy, it shall be legal and shall be a recommendation to the Judge of imprisonment for life. Such recommendation shall be binding upon the Judge. (Emphasis supplied); (TT, p. 238).

> (c) He charged, in full, Ga.Code Ann. § 26–3102, the statute which provides that aggravating circumstances must be found before a jury may impose a sentence of death. Its only reference to a sentence less than death is: "Where a sentence of death is not recommended by the Jury, the Court shall sentence the Defendant to imprisonment as provided by law."; (TT, pp. 238–239).

> (d) The jury verdict form, read in charge to the jury, provided a blank space to be checked if the jury wished to impose less than a death sentence;

> (e) The trial judge further charged:

> Now, Ladies and Gentlemen, I charge you that you shall not in your verdict as to punishment on Counts 1, 2, or 3 against this Defendant, recommend punishment by death if you find the statutory aggravating circumstances exist under the influence of passion, prejudice, or any other arbitrary factor.... (TT, p. 240);

> (f) In the final words of his charge, the trial judge stated: "If you do not find either of the statutory aggravating circumstances, then, the penalty will automatically be life imprisonment."

> 51. The inclusion in the charge to the jury in the penalty phase of Petitioner's trial of a reference to Ga.Code Ann. § 27–2302 (paragraph 50(b), (*supra*) may have created an impression in the minds of the jurors that mercy could only be recommended for crimes other than homicide. Absent a clear charge that a life sentence may be imposed even if aggravating circumstances are present, this charge may have been highly prejudicial to Petitioner.

not challenge the court's failure to adequately instruct the jury regarding mitigating circumstances. In keeping with our general policy not to review claims raised for the first time on appeal, I would not address this claim. *See Ross v. Kemp,* 756 F.2d 1483, 1486 (11th Cir.1985) (en banc) (reinstating panel opinion declining to address merits of *Westbrook* claim first raised at oral argument); *Stephens v. Zant,* 716 F.2d 276, 277 (11th Cir.1983) (per curiam).

Alternatively, I would remand the claim to the district court. Peek's petition asserts that he was denied effective assistance of counsel, one of counsel's alleged deficiencies being:

> Counsel for petitioner failed to file any Requests to Charge in the penalty phase of the trial, thereby insuring that the jury would be uninstructed on the defini-

> 52. The trial judge charged the jury that they should not impose a sentence of death, "if you find the statutory aggravating circumstances exist under the influence of passion, prejudice or any other arbitrary factor." (paragraph 50(e), *supra* ). The inclusion of this language, taken from that part of the statute which sets out a part of the appellate review by the Georgia Supreme Court, could only serve to confuse the jury further.

> 53. Hearing the charge as a whole, the jury could only conclude that a life sentence could be recommended only if they determined that no aggravating circumstances were present. Peek's Habeas Corpus Petition at 12–14.

**4.** The magistrate's findings regarding Peek's ineffective assistance of counsel claim are as follows:

> Petitioner's counsel filed a motion in limine to thwart the state's use of petitioner's incriminating statements and a motion to suppress evidence. He conducted a voir dire examination of the prospective jurors, most of whom he knew, and cross-examined thoroughly the state's witnesses. Petitioner's counsel also filed motions for discovery, recommendation, and physical and mental evaluation. He attended petitioner's commitment hearing and cross-examined the state's witnesses. In the face of this performance, petitioner has compiled a laundry list of errors of commission and omission allegedly committed by his counsel. However, ... this court concludes that petitioner's attorney provided him reasonably effective assistance of counsel throughout all phases of his trial on direct appeal. Understandably petitioner is not sat-

tion and meaning of "extenuation" and "mitigation."

Petition at 19. Even if we accord this language the broadest possible reading and consider it as having raised the *Westbrook* issue, *cf. Finney,* 709 F.2d at 646–47 (justice required addressing *Westbrook* claim couched in terms of ineffectiveness of counsel), neither the magistrate nor the district court discovered it.[4] In addressing Peek's ineffective assistance of counsel claim, the magistrate merely found that no errors were of constitutional dimension. Thus, the magistrate's finding regarding any *Westbrook* claim could only have been that Peek's attorney was not deficient in neglecting to request a specific charge defining mitigating circumstances. The district court, after a *de novo* review of Peek's petition, adopted the magistrate's findings and recommendation.[5] These find-

> isfied with the results of his attorney's efforts or lack thereof, but the sixth amendment does not provide the right of satisfaction.... Most of petitioner's allegations involve questions of deliberate courtroom strategy.... In this case, any shortcomings or errors in judgment made by petitioner's attorney either do not in fact constitute errors or do not rise to constitutional proportion and no exceptional circumstances exist to permit second-guessing his management of petitioner's trial and appeal.... Petitioner's counsel's performance passes constitutional muster.

Proposed Findings of Fact and Conclusions of Law at 7–9 (citations omitted).

**5.** The entire finding regarding the Peek jury instructions are as follows:

> JURY INSTRUCTIONS
>
> Petitioner contends the trial court charged the jury improperly on its option to impose life imprisonment if it found the existence of statutory, aggravating circumstances. In *Chenault v. Stynchcombe,* 581 F.2d 444 (5th Cir. 1978), the United States Court of Appeals for the Fifth Circuit applied *Lockett v. Ohio,* 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978) and *Bell v. Ohio,* 438 U.S. 637 [98 S.Ct. 2977, 57 L.Ed.2d 1010] (1978) to require the trial court to "clearly instruct the jury about mitigating circumstances and the option to recommend against death." This court finds, taking the charge as a whole, that the trial court clearly instructed the jury concerning their option to recommend against death. At least four times the trial court instructed the jury that the death penalty and life imprisonment

ings do not address whether mitigating circumstances were adequately defined.

The majority, assuming that both the district court and the magistrate considered an implicit *Westbrook* claim, determines that the jury instructions adequately informed the jury as to the nature and function of a mitigating circumstance. The majority bases its holding on the premise that the "jury could not have misunderstood the meaning and function of mitigating circumstances." Ante at 1494–1495. Because the lower court neither considered this claim nor found facts that could lead to the majority's inference, we should remand this case to the district court to determine whether a *Westbrook* claim was raised and, if so, whether the instructions adequately described the function of mitigating circumstances. *See Stepanian v. Addis,* 782 F.2d 902 (11th Cir.1986) (per curiam) (claim not ruled on by district court not considered on appeal).

B. *The Merits of the Westbrook Claim*

Assuming the merits of Peek's *Westbrook* claim were properly before us, I would join Judge Hatchett's dissent. I write separately to underscore that, in my view, the majority has misapplied *Francis v. Franklin,* —— U.S. ——, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985). In *Franklin,* instructions on intent were held constitutionally inadequate because a juror could have

understood them in an unconstitutional manner. The majority recognizes that:

the Constitution requires that there be no reasonable possibility that a juror will misunderstand the meaning and function of mitigating circumstances, *i.e.,* that the law recognizes the existence of circumstances which in fairness or mercy may be considered as extenuating or reducing the punishment.

Ante at p. 1494. The majority finds two passages which it believes sufficient to meet constitutional requirements. First, the instruction at one point referred to mitigation as on "the one hand," and aggravation "on the other." Second, the charge gave an example of a sentencing consideration: the presence or absence of a criminal record.

Although it is possible that keen jurors may have made the inferences adopted by the majority, it is quite possible that they could have failed to make them. Under the majority's reasoning *no* instruction would be necessary: the jury could simply infer that because the defense presents evidence, that evidence is to be considered in favor of mercy. Moreover, the criminal record example relates specifically to an aggravating circumstance and gives the jury no guidance with respect to the great majority of mitigating circumstances that do not have a counterpart aggravating circumstance.[6] The majority concludes that the

---

were alternative recommendations in the event it found an aggravating circumstance. In concluding his instructions to the jury, the trial court stated "You must write your verdict as you have before and you must determine as I have said, if you find an aggravating circumstance, indicate whether you recommend the Death Penalty or a Life Imprisonment." These charges on aggravating circumstances clearly do not require a sentence of death if aggravating circumstances were found, but merely authorize a death penalty. This court concludes that the jurors would fully understand their duties and prerogatives under the charge as given in this case.

**6.** The majority also notes that "[t]he jurors would surely have assumed" that Peek's lack of a criminal record was a mitigating circumstance and that this factor would have "played a common sense role" in defining mitigating cir-

cumstances. The *Francis v. Franklin* standard, however, is not whether a juror could have or would have understood the instructions in a constitutional manner; the question is whether it was possible that the juror could have understood the instructions in an unconstitutional manner. Thus, what the jurors "would surely have assumed" about Peek's lack of a criminal record consistent with the Constitution is irrelevant to our analysis.

The majority intuits that Peek's age and lack of a criminal record "may have been considered" even though this evidence was not presented to the sentencing jury. The majority further intuits that the jury "would surely have assumed" these mitigating circumstances existed because the prosecutor did not mention them. Thus, the majority concludes that the jury "could [not] have failed" to understand the function of two mitigating factors based on assumptions the jury *might* have made regarding evidence that *might* have been before it.

instructions here rely on jurors' "common sense" to divine the proper meaning and role of mitigating circumstances from "self-evident" sentencing considerations. The nuances and ramifications of capital sentencing, however, are too complex and significant to permit reliance on instructions that tacitly assume all jurors know the nature and function of mitigating circumstances. *See Eddings v. Oklahoma,* 455 U.S. 104, 117–18, 102 S.Ct. 869, 878–79, 71 L.Ed.2d 1 (1982) (O'Connor, J., concurring) (extraordinary precautions "guarantee, as much as is humanly possible, that the [death] sentence was not imposed out of whim, passion, prejudice, or mistake."); *Spivey v. Zant,* 661 F.2d at 471 (in most cases, a "judge must clearly and explicitly instruct the jury about mitigating circumstances").[7] In sum, the *Peek* instructions fail to eliminate the possibility that the jury understood the nature and function of mitigating circumstances in an unconstitutional manner. Accordingly, I cannot join this court's opinion on the *Westbrook* issue.

### CONCLUSION

I concur in the result reached by the majority concerning Peek's juror substitution claim and concur with the majority's disposition of Peek's claim regarding the failure of the trial court to reinstruct the jury. I respectfully dissent from section two of the majority opinion.

JOHNSON, Circuit Judge, dissenting, in which CLARK, Circuit Judge, concurs:

Petitioner was tried, convicted, and sentenced to die in a marathon proceeding beginning at 9:00 a.m. on July 28, 1976, and ending after 2:00 a.m. the following morning. The jury deliberations on the issue of guilt did not begin until about 10:30 p.m. During these deliberations, juror Chester Greeson eventually became the lone holdout for a verdict of "not guilty." At midnight, the trial judge asked the jurors if they wished to retire for the night; the judge agreed to the foreman's request for about fifteen minutes' extra deliberation time. Then, at about 12:30 a.m., the foreman returned to the courtroom to request the removal of juror Greeson.

Greeson testified at a state habeas hearing that the deliberations placed him under great stress and made him feel physically uncomfortable. The foreman proposed to him that he agree to be excused from the jury; Greeson acquiesced in this proposal. At this point, the foreman asked the judge to excuse Greeson from the jury. Without interrogating or even viewing Greeson, and without making any findings for the record, the judge agreed to this request and substituted an alternate juror, Ben Weinstein. Although counsel for both sides agreed to this substitution, the defendant was neither present in the courtroom nor consulted in this decision.

After agreeing to substitute the first alternate juror for Greeson, the trial judge failed to instruct the jury to begin its deliberations anew. Until this point, alternate juror Weinstein had not participated at all in the deliberations. The transcript of the proceedings shows that, after the juror substitution, the jury "deliberations" lasted only three more minutes.[1] Weinstein entered the jury room at 12:42 a.m. At 12:45 a.m., the jury returned to announce a verdict of "guilty."

---

7. *Spivey* noted that a court need not explicitly mention mitigating circumstances where a statute, such as the Texas statute, provides special jury interrogatories that focus attention on the defendant's culpability and prospects for rehabilitation. Of course, Georgia law provides no such interrogatories. Moreover, nothing in *Spivey* suggests that, as here, a jury may remain virtually uninstructed regarding mitigating circumstances.

1. The majority notes that, although the trial transcript indicates that it took three minutes for the jury to return a verdict after Weinstein entered the deliberations, the testimony of various participants in the trial indicates that it took between fifteen and thirty minutes. I am not willing to accept this oral testimony, which was given at a hearing several years after the trial, against the evidence of a transcript that was prepared contemporaneously with the trial, by a court reporter charged with the duty of recording all the events that occurred at the trial and the times of their occurrence.

In concluding that Greeson was properly excused from the jury, the majority of this Court focuses almost exclusively on the question of whether, at 12:30 a.m., Greeson was in fact able to continue participating in the jury's deliberations. In so focusing, the majority completely ignores several more significant issues related to the propriety of the jury substitution in this case, even assuming that Greeson was unable to continue deliberating at the particular time he was replaced as a juror.

There are three separate reasons I cannot agree with the majority opinion on the juror substitution issue. First, because there was no judicial inquiry or finding regarding Greeson's purported illness prior to the juror substitution, the substitution was improper whether or not Greeson was in fact ill. Second, even if the trial court had determined that Greeson was ill, substituting an alternate juror at that time would have been improper under the circumstances of this case. Third, by sending the jury back for further deliberations with a new juror at 12:30 a.m. without instructing the jury to begin its deliberations anew, the trial court placed undue coercion on the new juror and rendered petitioner's trial fundamentally unfair.

A. Juror substitution improper absent judicial inquiry.

Under Georgia law, a juror may be excused and replaced if he is unable to perform his duty as a juror because he becomes ill. Ga.Code Ann. § 15–12–172. In the state habeas proceeding, the court held that Greeson was properly excused under Georgia law. The state court made no finding whatsoever that Greeson was ill at the time of his excusal or, more importantly, that the trial court had so found prior to Greeson's excusal.

Nonetheless, the majority of this Court concludes that the state habeas court "found" (1) that Greeson's emotional and physical state impaired his voting and participating in deliberations, and (2) that the trial judge formed the correct impression that Greeson was ill and unable to continue deliberating at that time. The majority states that these findings are fairly supported by the record, and are therefore to be accorded a presumption of correctness under 28 U.S.C.A. § 2254(d).

Based on the record before this Court, it is impossible for us conclusively to determine whether Greeson was in fact ill at the time he was excused from the jury. Contrary to the majority's conclusion attributing to the state court the findings that Greeson was ill and unable to continue deliberating, these "findings" are simply factual inferences that the *majority of this Court* draws to support the legal conclusion of the state habeas court. Although a federal habeas court is supposed to defer to properly supported factual findings of a state court, the federal court owes no deference to the state court's holdings on issues of federal law. By inferring certain "factual findings" from the state court's legal conclusions, the majority of this Court in effect converts reviewable legal conclusions of a state court into unreviewable findings of fact.

Since the state habeas court made no factual findings regarding the circumstances under which Greeson was excused and, specifically, whether Greeson was ill and unable to continue as a juror, the federal habeas court cannot possibly presume that such "findings" are correct. The district court did not hold an evidentiary hearing in the present case but, rather, limited its review to the transcripts of the trial and the state habeas proceeding. In light of the district court's failure to hear testimony or observe witnesses, the district court's findings are entitled to less deference than they would otherwise be entitled to under the "clearly erroneous" standard of review. *See Green v. Russell County,* 603 F.2d 571, 573 (5th Cir.1979).

The circumstances of Greeson's removal strongly suggest that, at the time Greeson was excused, he was not too ill to continue serving as a juror but, rather, had been pressured into resigning his position on the jury. The jury began hearing evidence at 9:00 a.m., and did not even commence its

deliberations until the late hour of 10:30 p.m. Eventually, the jury became divided eleven-to-one in favor of conviction, with Greeson remaining the lone holdout. This situation continued for between thirty and forty minutes.

At the state habeas hearing, Greeson testified, "I knew I was going to have difficulty making a decision but I think it was more the decision—in other words, the way the other eleven had decided to go and I didn't think I was—it was a combination. I was upset. I didn't think I could and I was—I couldn't even think any more...."

Greeson testified that, prior to his removal from the jury, he was under great stress. After his excusal, however, Greeson immediately began to feel better—so much so that he declined any assistance and drove himself home. The main evidence at the habeas hearing that Greeson had been ill was provided by the jury foreman who had requested Greeson's excusal. The jury foreman testified that Greeson had a reddened complexion, had begun to sweat, and was making frequent trips to the restroom. The foreman also testified that Greeson "wasn't cooperative ... he just couldn't participate in ... my idea of a jury deliberation." Greeson continued to cast his vote in favor of acquittal, although he ceased to participate in the discussions.

The ambiguity of the post-conviction testimony as to whether Greeson was actually ill highlights the main problem with the present case: namely, that Greeson was excused from the jury without any prior judicial determination that he was in fact ill. The trial court never observed Greeson prior to excusing him. Rather, the trial court based its excusal of Greeson *solely* on the word of the jury foreman, who had an opposing view to the juror whose excusal the foreman sought. The majority holds that Greeson was in fact ill and, therefore, that the absence of a judicial inquiry into his purported illness caused Greeson no prejudice. I am not satisfied that Greeson was too ill to continue serving as a juror, at a reasonable hour and after having had some rest. In any event, I

would hold that, absent a prior judicial determination which entails at least the observation of the juror in question and findings of fact, a court cannot excuse a juror on the grounds of illness. To permit the excusal of a juror without such an inquiry creates an undue risk that the defendant will be unfairly deprived of his right to be convicted only upon agreement by the requisite number of jurors, through the excusal of those jurors who disagree with the majority.

**B. Juror substitution not justified by circumstances of this case.**

As the majority states, the right to a fair trial and impartial jury entitles a defendant in a criminal case to be tried by the jury originally selected to determine his guilt or innocence. Some instances justify the subordination of this right to the public's interest in fair trials designed to end in jury verdicts. *Wade v. Hunter*, 336 U.S. 684, 689, 69 S.Ct. 834, 837, 93 L.Ed. 974 (1949). In order to determine the constitutionality of juror substitution, courts should examine the totality of the circumstances involved in the particular case. *Cf. United States v. Fossler*, 597 F.2d 478, 485 (5th Cir.1979) (in assessing whether a jury verdict was improperly coerced, courts have examined the totality of the circumstances). In the present case, such an examination requires us to take into account the information known, and the alternatives available, to the trial court at the time Weinstein was substituted for Greeson.

At midnight, the jury foreman requested fifteen more minutes to deliberate. This was evidence of the fact that the jury was close to reaching a verdict. The request to replace a juror so soon thereafter should have alerted the trial court to the possibility that the juror was a lone holdout, whose excusal could enable the jury to break a deadlock.

At this point, the judge had several alternatives available to him. The most obvious alternative at 12:30 a.m. was to ask the jury to cease deliberating until a more reasonable time and after some rest. If Gree-

son remained ill the following morning, the judge could have considered whether to excuse Greeson or declare a mistrial at that time.

A second reasonable alternative was to declare a mistrial. Based on the circumstances surrounding the highly unusual request to replace a juror at 12:30 a.m. and permit the jury to continue deliberating, the judge could have inferred that a juror was being pressured into resigning from the jury so that the remainder of the jurors could reach a unanimous verdict. " 'The principle that jurors may not be coerced into · surrendering views conscientiously held is so clear as to require no elaboration.' " *Jenkins v. United States*, 380 U.S. 445, 446, 85 S.Ct. 1059, 1060, 13 L.Ed.2d 957 (1965).

Generally, cases in which juror substitution has been permitted have involved long and expensive trials. *See, e.g., United States v. Kopituk*, 690 F.2d 1289 (11th Cir.1982), *cert. denied*, 461 U.S. 928, 103 S.Ct. 2089, 77 L.Ed.2d 300 (1983); *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). The declaration of a mistrial in the present case would not have subjected the state to any great expense, since the trial had lasted only one day. By declaring a mistrial instead of dismissing Greeson, the trial judge would have alleviated the significant risk that a verdict would have resulted "from pressures inherent in the situation rather than the considered judgment of all the jurors." *Arizona v. Washington*, 434 U.S. 497, 509, 98 S.Ct. 824, 832, 54 L.Ed.2d 717 (1978).

Even if Greeson was actually ill, the public's interest in seeing this trial end in a verdict was not strong enough to justify the risks entailed by juror substitution. Juror substitution may not have been nec-essary to achieve a verdict: there is no evidence that Greeson would have been unable to continue deliberating at a more reasonable hour. In addition, the trial judge could have inferred that Greeson was the lone holdout, and that his illness was the product of his disagreement with the other jurors.[2] Yet, the trial court inexplicably failed even to try to ascertain whether Greeson was subject to coercion, or whether Greeson would be able to continue deliberating after some rest. Under these circumstances, Greeson's excusal unfairly deprived petitioner of his right to be tried by the jury originally selected to determine his guilt or innocence, and rendered petitioner's trial fundamentally unfair.

C. The jury should have been instructed to begin deliberations anew.

After substituting Weinstein for Greeson, the trial judge failed to instruct the jury that it should begin its deliberations anew, or that the jurors should review the evidence with Weinstein. Such instructions would have permitted Weinstein to consider the observations of the other jurors, and would have permitted the others to consider Weinstein's observations. *See United States v. Phillips, supra*, 664 F.2d at 991. Only three minutes after Weinstein entered the jury room, the jury returned a verdict of "guilty."

Weinstein was sent into the jury room to begin deliberations on the case for the first time at 12:42 a.m. Under these circumstances, there was a great danger that Weinstein would be coerced into joining the majority in a determinative vote before full and meaningful deliberations had been conducted. *See United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir.1975). The fact that the deliberations lasted only three minutes is an overwhelming indication that the deliberations were curtailed in just this

---

**2.** By narrowly focusing on the question of whether Greeson was in fact ill at the time of his removal, the majority completely ignores the . question of whether, if the circumstances of jury deliberations are unduly coercive of a verdict and a holdout juror subsequently becomes ill and resigns, the trial proceeding is inherently unfair. By the majority's approach, the circumstances connected to a juror's illness and subsequent removal would be inconsequential. Thus, for example, a trial judge could replace a juror who became ill as the result of threats of physical harm from other jurors.

manner. *See State v. Lehman*, 108 Wis.2d 291, 321 N.W.2d 212 (1982) (substitution of juror not harmless where pre-substitution jury deliberated for one hour and 35 minutes, and post-substitution jury deliberated for one hour and 21 minutes). By sending Weinstein into the jury room at that late hour with no supplemental instructions, the trial court denied petitioner his right to a unanimous jury verdict reached through full and fair deliberations, and rendered petitioner's trial fundamentally unfair.

The Supreme Court recently reiterated that, for a proceeding to be consistent with the requirements of the Due Process Clause, the proceeding must not be fundamentally unfair. *Wainwright v. Greenfield*, —— U.S. ——, ——, 106 S.Ct. 634, 639–40, 88 L.Ed.2d 623 (1986). Because petitioner's trial was fundamentally unfair, his conviction was obtained in violation of the Due Process Clause and should be set aside. Accordingly, I dissent.

HATCHETT, Circuit Judge, dissenting, in which GODBOLD, Chief Judge, JOHNSON and CLARK, Circuit Judges, concur:

The majority acknowledges in section II of its opinion that the jury instructions at issue here are "virtually indistinguishable" from those which we found constitutionally inadequate in *Westbrook v. Zant*, 704 F.2d 1487, 1503 (11th Cir.1983). At 1486, 1487, 1489. The majority construes *Westbrook* (1) as having "focused on just one sentence of the trial court's charge", at 1489, *see also* 1489 n. 11; and (2) as requiring the use of "particular words or phrases to define the concept of mitigation or the function of mitigating circumstances," at 1494. I do not agree with the majority's characterization of *Westbrook;* therefore, I respectfully dissent from section II of the majority opinion.

### I.

Contrary to the majority's assertions, it is clear that, in evaluating the mitigating circumstance instruction before it, the *Westbrook* court examined the jury charge as a whole. 704 F.2d at 1501, 1503. *Westbrook* unequivocally held:

> [T]he [trial] court failed to define and describe for the jury the nature and function of mitigating circumstances. Cognizant of the standard applied in federal habeas corpus proceedings, we reach this conclusion *not viewing singular aspects of the charge in isolation, but as a whole to determine the charge's adequacy.*

704 F.2d at 1501 (emphasis added) (citing *Cupp v. Naughton*, 414 U.S. 141, 146–147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973)).

### II.

I agree with the majority that the Constitution does not require that capital sentencing instructions include any particular words or phrases to define the concept of mitigation. I do not agree, however, that *Westbrook* requires the use of any such magical words.

In *Spivey v. Zant*, 661 F.2d 464, 471 (5th Cir. Unit B 1981), *cert. denied*, 458 U.S. 1111, 102 S.Ct. 3495, 73 L.Ed.2d 1374 (1982), we held that

> when a jury is charged with the decision whether to impose the death penalty, the jury must receive clear instructions which ... 'guid[e] and focu[s] the jury's objective consideration of the particular circumstances of the individual offense and the individual offender....' *Jurek v. Texas*, 428 U.S. [262, 274, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976) ].

We went on to explain that

> [i]n most cases, this will mean that the judge must clearly and explicitly instruct the jury about mitigating circumstances and the option to recommend against death; in order to do so, the judge would normally tell the jury what a mitigating circumstance is [footnote omitted] and what its function is in the jury's sentencing deliberations.

*Spivey*, 661 F.2d at 471. We recognized that in some instances, such as where special interrogatories are used, "it will be

possible for the judge clearly to instruct the jury so as to guide and focus its consideration of the particularized circumstances of the individual offense and the individual offender without explicitly defining the nature and function of mitigating circumstances...." *Spivey,* 661 F.2d at 471 (footnote omitted).[1]

We found the jury instructions in *Westbrook* inadequate because they did not comply with the *Spivey* requirement that either jury instructions describe the nature and function of mitigating circumstances or the jury be guided toward the consideration of mitigating circumstances by special interrogatories. *Westbrook,* 704 F.2d at 1503; *see Spivey,* 661 F.2d at 472.

The instructions in *Spivey* did not refer to "mitigation" or "mitigating circumstances." The majority attempts to distinguish *Westbrook* from *Spivey* on the ground that in *Westbrook,* "the sentencing judge had given, as did the judge in the instant case, instructions concerning mitigating circumstances. In particular, the sentencing judge had given an instruction authorizing the jury to 'consider the facts and circumstances, if any, in extenuation, mitigation, or aggravation of punishment....'" At 1489 (quoting *Westbrook,* 704 F.2d at 1501).[2]

The majority concedes that "this instruction, standing alone, does not adequately

define the meaning of 'mitigation' or 'extenuation,' nor does it explain the role of these concepts in the jury's task.... A reasonable juror may not understand the meaning of such legalistic terms, [footnote omitted] nor are their meanings made clear in the context of that sentence alone." At 1490.

I agree with this observation. I do not agree, however, that the trial court's reference to the statute and to mitigating circumstances "on the one hand" and aggravating circumstances "on the other hand" is sufficient to meet the *Spivey* requirement that jury instructions "guid[e] and focu[s]" the jury's deliberations.

The trial court instructed the jury:

However, it is not essential to your decision that you find extenuating or mitigating facts on the one hand, or facts and circumstances in aggravation on the other.

It also quoted the following from the Georgia death penalty statute:

In such hearings subject to the laws of evidence, the Jury shall hear additional evidence in extenuation, mitigation and aggravation of punishment including the record of any prior criminal convictions and pleas of guilty or pleas of Nolo Contendre of the Defendant or the absence of any such prior criminal convictions

---

**1.** The majority characterizes this portion of our *Spivey* holding as dicta. At 1494 n. 16. It reads *Spivey* "to *imply* that only rare cases will pass constitutional muster without an explicit definition of the meaning and function of mitigating circumstances...." At 1494 n. 16 (emphasis added). *Spivey expressly* holds that those instances in which the trial judge need not explicitly define the nature and function of mitigating circumstances are exceptions to the general rule. 661 F.2d at 471 n. 9.

The majority implies at the beginning of its discussion of this issue that it is carving out another exception to the requirement of an explicit definition of the concept of mitigation. It disingenuously intimates that the particular facts and circumstances of "this case" compel it to reach the result which it does. At 1486. In stating that the exceptions might not be as rare as *Spivey* implies, the majority is not merely broadening the scope of exceptions which apply to the rule, it is completely abolishing the rule. The majority relies upon "the ordinary pro-

cesses of a trial ... to eliminate" the trial court's instructions. At 1492 n. 13. In nearly every case, the trial court will ask the prosecution if it has any evidence to present in aggravation and ask the defense if it has any evidence to present in mitigation, and then read the subject portions of the statute to the jury. What *Spivey* perceived as an exception to the rule has now become the rule.

**2.** This fallacious distinction comes dangerously close to invoking a requirement of "particular words or phrases," an evil to which the majority intimates the *Westbrook* court fell prey. It fails to focus upon the *quality* of the instruction. The dictates of *Spivey* are equally applicable where the instructions make passing reference to mitigating circumstances, such as in *Westbrook* and in this case, as they are where the instructions are completely lacking in any reference to mitigating circumstances.

and pleas. Provided; however, that only such evidence in aggravation as the State has made known to the Defendant prior to his trial shall be admissible.

The majority finds "implicit" in these two instructions an allocation of the aggravation function to the state and the mitigation function to the defendant, which makes "self-evident" the function of aggravating and mitigating circumstances. The majority concludes: "It was not necessary for the trial judge to tell the jury that [Peek's young age and lack of criminal record might have been] considered in mitigation; their mitigating tendency was self-evident." At 1493.

This conclusion cannot be reconciled with the majority's recognition that "[a] jury which does not understand that the evidence and argument presented to it can be considered in mitigation of punishment cannot give a capital defendant the individualized sentencing hearing which the Constitution requires." At 1488. After the trial court instructed the jury that it could consider mitigating circumstances and aggravating circumstances "if any," it proceeded to explain that "of course, *no evidence* was submitted." (Emphasis added.) The trial court then instructed the jury that it need not find mitigating circumstances or aggravating circumstances. In light of these two instructions, and the lack of any instructions explicitly defining mitigating circumstances, there exists a reasonable likelihood that the jury understood the instructions in an unconstitutional manner and did not consider either Peek's age or lack of criminal record. *Francis v. Franklin*, —— U.S. ——, —— n. 8, 105 S.Ct. 1965, 1975–76 n. 8, 85 L.Ed.2d 344, 359 n. 8 (1985). This likelihood is bolstered by the fact that, as the majority acknowledges, "there was *no evidence* specifically presented concerning a past criminal record or, the lack thereof." At 1492 (emphasis added).

While unlike *Spivey* in that it does refer to mitigating circumstances, the charge here is very much like *Spivey* in that it unduly emphasizes aggravating circumstances. The overriding message of the charge is that the jury need find only one statutory aggravating circumstance to impose the death penalty. If the nature and function of both mitigating and aggravating evidence is, as the majority concludes, so self-evident that the jury need not be clearly instructed, why should we *assume* that the jury will recognize and appreciate the significance of mitigating evidence and yet *expressly* instruct it on aggravating circumstances? At 1491.

*Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972) "mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932–33, 49 L.Ed.2d 859 (1976). "Since the members of a jury will have had little, if any, previous experience in sentencing, they are unlikely to be skilled in dealing with the information they are given." *Gregg*, 428 U.S. at 192, 96 S.Ct. at 2934. The potential for a jury's indiscriminate exercise of its discretion is alleviated if the jury is given guidance regarding the particularized circumstances of the individual offense and the individual offender. In *Spivey*, we held that this guidance must come in the form of either an instruction clearly and explicitly defining the nature and function of mitigating circumstances or special interrogatories. 661 F.2d at 471–72. The instructions in this case do not meet this requirement.[3]

"It is quite simply a hallmark of our legal system that juries be carefully and adequately guided in their deliberations." *Gregg*, 428 U.S. at 193, 96 S.Ct. at 2934.

---

**3.** Trial counsel's failure to object to the inadequate instructions is not dispositive of Peek's claim. It means merely that we review the instructions for plain error to determine wheth-
er they were so deficient as to affect the fairness or integrity of the trial. *United States v. Granville*, 716 F.2d 819, 821 (11th Cir.1983). This standard is met here.

When an individual's life is at stake, it is not enough to rely upon the jury's presumed "common sense" and the purported "self-evident" nature of the evidence. The majority itself recognizes that "the only sure way to attain the constitutional minimum is for the jury charge to explicitly define the meaning and function of mitigating circumstances." At 1494 n. 16.